UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANTHONY MALIK ELLIS,

                                  Plaintiff,

        v.

LT. CATALANO, *et al.*,

                                  Defendants.

No. 16-CV-8452 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Anthony Malik Ellis
Newark, NJ
*Pro Se Plaintiff*

Janice Powers, Esq.
New York State Office of the Attorney General
White Plains, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

        Pro se Plaintiff Anthony Malik Ellis ("Plaintiff"), currently incarcerated in Essex County

Correctional Facility, brings this Action, pursuant to 42 U.S.C. § 1983, against several prison

officials in Fishkill Correctional Facility.  Plaintiff alleges that Correctional Officers Sean Crowe

("Crowe"), Thomas Osowick ("Osowick"), James Sonko ("Sonko"), Martin Rivera ("Rivera"),

Ray LaTourette ("LaTourette"), Jay Catalano ("Catalano"), and Sergeants Keith Montgomery

("Montgomery") and Paul Nedorost ("Nedorost"), (collectively, "Defendants") subjected him to

cruel and unusual punishment in violation of the Eighth Amendment during several incidents in

September 2016.[1]  (*See generally* Am. Compl. (Dkt. No. 15).)  Before the Court is Defendants'

Motion for Summary Judgment ("the Motion").  (Not. of Mot. for Summ. J. ("Not. of Mot.")

(Dkt. No. 141).)  For the following reasons, the Motion is granted in part and denied in part.

## I.  Background

### A.  Factual Background

The following facts are taken from the exhibits submitted, (Dkt. Nos. 132–41), and

Defendants' Statement pursuant to Local Civil Rule 56.1, (Defs.' Rule 56.1 Statement ("Defs.'

56.1") (Dkt. No. 130)).[2]  These facts are recounted "in the light most favorable to" Plaintiff, the

---

[1] Plaintiff's Amended Complaint also named as Defendants ophthalmologist Dr. Steven Zabin ("Zabin"), Superintendent Cunningham, and Offender Rehabilitation Coordinators ("ORCs") Chauvin and Ream.  (*See* Am. Compl. 5.)  However, Zabin and Chauvin were dismissed without prejudice at the request of Plaintiff on October 4, 2017.  (Dkt. No. 62.)  Similarly, Ream and Cunningham were dismissed with prejudice with Plaintiff's consent on March 14, 2018.  (Dkt. No. 89.)

[2] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Civ. R. 56.1(a).  The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  "A pro se litigant is not excused from this rule," *Brandever v. Port Imperial Ferry Corp.,* No. 13-CV-2813, 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (italics omitted), and "[a] nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible," *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009); *see also Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012) (same).  Here, Defendants filed and served their Statement pursuant to Rule 56.1, (Dkt. No. 130), and filed and served a Statement notifying Plaintiff of the potential consequences of not responding to the Motion, as required by Local Rule 56.2, (Dkt. No. 131).  Despite this notice, Plaintiff failed to submit a response to Defendant's 56.1 Statement of Facts.  Accordingly, the Court may conclude that the facts in Defendants' 56.1 Statement are uncontested and admissible.  *See Brandever,* 2014 WL 1053774, at *3 (concluding that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material issues of fact"); *Anand v. N.Y. State Div. of Hous. & Cmty. Renewal,* No. 11-CV-9616, 2013 WL 4757837, at *7 (S.D.N.Y. Aug. 29, 2013) (same).

non-movant.  *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (citation and

quotation marks omitted).  The facts as described below are not in dispute, except to the extent

indicated.

### 1.  The September 11, 2016 Incident

On September 11, 2016, Plaintiff was in his cell in the Special Housing Unit ("SHU") at

Fishkill Correctional Facility.  (Defs.' 56.1 ¶¶ 1–2; Decl. of Sean Crowe ("Crowe Decl.") ¶ 2

(Dkt. No. 133); Not. of Mot. Ex. K ("Pl.'s Dep."), at 32 (Dkt. No. 141-9).)  At about 4 p.m.,

Defendant Crowe announced the evening meal and ordered Plaintiff to get dressed for the meal.

(Defs.' 56.1 ¶¶ 31–34.)  While Crowe maintains that Plaintiff "effectively refused" the meal by

failing to be "fully clothed at the [appropriate] time," Plaintiff attests that he did not refuse food

and was not undressed at any time that day.  (Crowe Decl. ¶ 11; Pl.'s Dep. 37.)  Both agree,

---

Nevertheless, in light of the "special solicitude" afforded to pro se litigants "when confronted with motions for summary judgment," *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988), the Court will "in its discretion opt to conduct an assiduous review of the record," including Plaintiff's deposition testimony, when deciding the instant Motion.  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 502 n.1 (S.D.N.Y. 2015) (considering "the statements and documents in [p]laintiff's opposition papers to determine if there are any material issues of fact based on the evidence in the record," but disregarding factual assertions that "do not contain citations to the record, or are not supported by the citations in the record"); *Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Benefit Fund*, 27 F. Supp. 3d 346, 349 (E.D.N.Y. 2014) ("Although plaintiffs did not file a Rule 56.1 statement, the Court has independently reviewed the record to ensure that there is uncontroverted evidence to support the paragraphs referenced in defendants' Rule 56.1."); *Pagan v. Corr. Med. Servs.*, No. 11-CV-1357, 2013 WL 5425587, at *2 (S.D.N.Y. Sept. 27, 2013) (explaining that "[t]he [c]ourt ha[d] considered the [motions for summary judgment] in light of the entirety of the record to afford [the pro se] [p]laintiff the special solicitude to which he [was] entitled" where the plaintiff failed to submit a Rule 56.1 response); *Cherry v. Byram Hills Cent. Sch. Dist.*, No. 11-CV-3872, 2013 WL 2922483, at *1 (S.D.N.Y. June 14, 2013) (italics omitted) ("[W]here a pro se plaintiff fails to submit a proper . . . Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." (quotation marks omitted)).

however, that Plaintiff was not given his evening meal.  (Crowe Decl. ¶ 11; Pl.'s Dep. 34).

Plaintiff therefore stood by the door to his cell and "started screaming for the audio to hear [him],

to let the record reflect that on this date and time, this officer refused to feed [him]."  (*Id.* at 36–

38.)  As an additional protest, Plaintiff blocked visual access to his cell during the nightly count

of inmates by placing a pillowcase or mattress in front of the small, rectangular window in his

cell door.  (*Id.* at 38–40; Defs.' 56.1 ¶ 2.)[3]  Plaintiff failed to respond to Crowe's verbal

commands to remove the object or to other officers' attempts to verify that he was safe and

present inside the cell.  (*Id.* ¶¶ 1–3.)[4]

Crowe called his colleague, Defendant Sonko, for assistance, and Sonko notified the area

supervisor, nonparty Sergeant ("Sgt.") Llorens.  (*Id.* ¶ 6.)  Llorens ordered Plaintiff to remove the

obstruction and banged on the cell door, but Plaintiff did not respond.  (*Id.* ¶¶ 7–8.)  Llorens then

directed Crowe and Sonko to enter Plaintiff's cell, and Sonko opened the door to find Plaintiff

holding the pillowcase up to the window.  (*Id.* ¶¶ 8–10.)  At this point, accounts diverge.

According to Defendants, Plaintiff swung a closed fist in Sonko's direction as Sonko opened the

door.  (*Id.* ¶ 12; Decl. of James Sonko ("Sonko Decl.") ¶ 5 (Dkt. No. 134).)[5]  By contrast,

---

[3] While Defendants' Declarations refer to a "mattress," Plaintiff's deposition refers to a "pillowcase."  (Pl.'s Dep. 39.)  The Court does not consider the distinction to be material, but adopts Plaintiff's version.

[4] According to Plaintiff, he engaged in similar behavior twice that evening.  During the evening's first inmate count, Plaintiff attempted to block his window, but a sergeant was able to see him, and so he was left alone.  (Pl.'s Dep. 40–41.)  It was only the during the second count, when Plaintiff again blocked visual access, that events escalated.  (*Id.* at 43–46.)

[5] Although Defendants argue that a prison video depicts Plaintiff swinging a fist at Sonko as he opened the door, the Court finds that the video is ambiguous with respect to this issue.  (*See* September 11, 2016 Video No.: ch04_2016091101618 ("Video 1618") at 20:25:05.)  (All videos discussed in this Opinion were transmitted by DVD as Exhibit L to Defendants' Notice of Motion, and are on file with the Court.  (*See* Not. of Mot. Ex. L (Dkt. No. 141-10).)  In this Opinion, each video is identified by the date and title by which it appears on that DVD.)

Plaintiff attests that he backed away from the door when Sonko entered, but that Sonko "started repeatedly punching me in my head and my upper torso area." (Pl.'s Dep. 45.) Plaintiff also denies "return[ing] any punches to Sergeant Sonko." (*Id.* at 52.) All Parties agree (and video evidence confirms), however, that within seconds, Plaintiff attempted to run out of the cell, and was tackled by Crowe as he entered the hallway. (*Id.* at 45–46; Defs.' 56.1 ¶¶ 13–15; Video 1618 at 20:25:15.) Crowe landed face-down with part of his upper body on top of Plaintiff, who landed on his back beneath Crowe. (*Id.*; Defs.' 56.1 ¶ 15.)

While Crowe pinned Plaintiff to the ground and Sonko held Plaintiff's legs, Plaintiff squirmed, threatened to bite Crowe, tried to flip, flailed his arms backward, and repeatedly kicked his legs. (*Id.* ¶¶ 16–18; Pl.'s Dep. 64, 74–75.)[6] Shortly thereafter, additional officers arrived, and several assisted in placing mechanical restraints on Plaintiff's wrists, but Plaintiff continued to struggle with the officers. (Defs.' 56.1 ¶¶ 19–20; Video 1618 at 20:26:19; Decl. of Keith Montgomery ("Montgomery Decl.") ¶ 4 (Dkt. No. 135).) Plaintiff attests that he began "screaming and yelling" in an attempt to "get the inmates that w[ere] around . . . riled up, so . . . it could start something bigger than just a use of force. It can start a riot that type of behavior." (Pl.'s Dep. 65.) Within minutes, Defendant Montgomery arrived as well, and Montgomery ordered that Plaintiff be placed in leg irons. (Defs.' 56.1 ¶¶ 21–22.) Crowe and Sonko restrained Plaintiff, holding his legs, arms, and body on the floor while he was placed in leg irons. (*Id.* ¶ 23.)

---

[6] Plaintiff acknowledges that he "tried to fight [the officers] off" and was "resisting them," but he also attests that the officers used force beyond simply body holds, describing Sonko as "dropping his elbow on my face and my head area" and "hitting me in the head with his elbows," and argues that the officers "weren't just trying to restrain" him, but were "assaulting" him. (Pl.'s Dep. 46–47; 56–57, 64.) Video evidence makes clear that Plaintiff continued to struggle as Crowe and Sonko sought to immobilize and pin him to the floor using their full bodies. (Video 1618 at 20:25:25.)

After Plaintiff was restrained, several officers, including Crowe, lifted Plaintiff up from the floor and placed him against a wall.  (*Id.* ¶¶ 23–24; Video 1618 at 20:30:15.)  At this point, Plaintiff attests that an officer, apparently Crowe, "grabbed [him] by the neck" such that he "started to get dizzy like [he] was going to pass out."  (Pl.'s Dep. 48.)  However, after Plaintiff said, "I can't breathe. I can't breathe," the officer released his neck.  (*Id.*)  After a little over a minute of being held against the wall by several officers, Plaintiff was pulled from the wall and led away by several of the same officers.  (Video 1618 at 20:31:40.)

On Montgomery's orders, nonparty officers Kaban and Murphy escorted Plaintiff to a "dry cell," a cell without a sink or toilet, for medical evaluation.  (Defs.' 56.1 ¶ 27; Montgomery Decl. ¶ 5.)  Before being placed in the cell, Plaintiff sat for several minutes on a bench outside the cell with several officers standing over him.  (September 11, 2016 Video, No. ch02_20160911202754 ("Video 2754") at 20:28:07.)[7]  At some point after being escorted to this new cell, Plaintiff attests he engaged in a verbal dispute with Montgomery, which culminated in Montgomery entering the cell and "punching" Plaintiff.  (Pl.'s Dep. 49.)[8]

---

[7] Although the Court refers to the time-stamp for all video evidence, it should be noted that the times reflected in those stamps may not accurately reflect the precise time of day. Indeed, as Plaintiff appears on two different videos at the same time-stamp, it is clear that the clocks in some of the videos are not aligned.  (*See, e.g.*, Videos 1618 and 2754, at 20:28:00.)

[8] It is not clear when this incident is alleged to have occurred.  According to video evidence, Montgomery was in the dry cell (and off-camera) with Plaintiff for a brief period (approximately one minute) during which several officers entered the cell to remove Plaintiff in advance of a nurse's arrival.  (Video 2754 at 20:46:05.)  In the period immediately afterward, Plaintiff and several accompanying officers were again off-camera, apparently in a cell across the hall from the previous cell.  (Defs.' 56.1 ¶ 60.)  Several minutes elapse before the nurse followed them off-camera.  (Video 2754, at 20:51:00.)  Although Plaintiff claims "there is video inside of the OBS cell where Sergeant Montgomery punched me," (Pl.'s Dep. 49), no video from inside of these cells has been provided to the Court.

Shortly thereafter, nonparty Nurse Pagliaro performed a full body exam on Plaintiff and noted "multiple superficial abrasions to the right and left shoulder, right back, bilateral chest wall, right shoulder, left eye and ear." (Defs.' 56.1 ¶ 28; Not. of Mot. Ex. D ("9/11/2016 Injury Report") (Dkt. No. 141-2).)[9]  Pagliaro also noted that Plaintiff complained of rib pain, but that he did not find crepitus or shortness of breath. (*Id.*)  Pagliaro also cleaned Plaintiff's abrasions and applied antibiotic ointment. (*Id.*)  Plaintiff was then examined by an Office of Mental Health ("OMH") nurse, nonparty Nurse Endrizzi, who determined that Plaintiff should be placed on suicide watch. (Defs.' 56.1 ¶ 29; Montgomery Decl. ¶ 5.)  Plaintiff was then taken to another unit, "R/West," and placed in an observation cell for suicide watch. (*Id.*; Pl.'s Dep. 73.)

While on suicide watch, Plaintiff spoke with another inmate from 10:30 p.m. to 11:15 p.m., used the bathroom at 11:20 p.m., resumed talking until 11:45 p.m., and fell asleep at 2:45 a.m. (Defs.' 56.1 ¶ 30.)  The next day, Plaintiff spent the morning talking to another inmate until he was seen by OMH at 10:30 a.m., and was then escorted to his block at 11:00 a.m. (*Id.*)

2.  The September 22, 2016 Incident

On the morning of September 22, 2016, Plaintiff was again in a cell in the SHU. (*Id.* ¶ 61.)  At approximately 11:25 a.m., Defendant LaTourette, who was on duty picking up food trays, approached Plaintiff's cell and smelled tobacco smoke. (*Id.* ¶¶ 62–63.)  LaTourette notified his superior, Defendant Nedorost, and they, together with Defendant Rivera, entered Plaintiff's cell. (*Id.* ¶ 64; Decl. of Ray LaTourette ("LaTourette Decl.") ¶ 3 (Dkt. No. 137).)[10]

---

[9] Although Plaintiff attests that he "was taken to x-ray" to ensure that his knee was not broken, it is not clear when this may have occurred. (Pl.'s Dep. 56.)

[10] While Plaintiff suggests that Defendant Osowick was present as well, (Pl.'s Dep. 82–83), Defendants maintain that Osowick did not arrive until after Plaintiff had been moved to a different observation cell, (Decl. of Thomas Osowick ("Osowick Decl.") ¶ 2 (Dkt. No. 138)).

LaTourette ordered Plaintiff to place his hands on a wall, but Plaintiff instead placed a blue object (identified by Plaintiff as a lighter) into his mouth and refused to spit it out. (Defs.' 56.1 ¶ 65; Pl.'s Dep. 82.)  According to Plaintiff, Defendants then "jumped on [him]," and "roughed [him] up a little bit," including Rivera kicking him in "[his] buttocks area." (*Id.* at 82–83.) Rivera then placed restraints on Plaintiff, and at Nedorost's instruction, Rivera and LaTourette escorted Plaintiff to an observation cell where he was placed on contraband watch. (Defs.' 56.1 ¶ 66.)

Rivera and LaTourette led Plaintiff into the observation cell with his arms shackled behind him and placed him face-down on the cell's bed. (*Id.* ¶ 85.)  The same officers, together with Nedorost and Osowick, then removed Plaintiff's wrist restraints, placed him against the cell wall (unshackled), and "pat frisked" his whole (clothed) body. (*Id.* ¶¶ 85–89.)  Plaintiff was then repeatedly ordered to strip for a search and to spit out the items in his mouth, but he refused to do so. (*Id.* ¶¶ 68–69.)  Throughout, Plaintiff was held against the wall by two officers maintaining holds on his wrists. (September 22, 2016 Video, No.: ch02_20160922110255 ("Video 0255") at 11:05:00.)  Defendant Catalano was notified about Plaintiff's conduct, and, upon arrival, he too ordered Plaintiff to strip and spit out the item in his mouth. (Defs.' 56.1 ¶ 70.)  Shortly after Catalano's arrival, the officers released their hold on Plaintiff and Plaintiff fully complied with the order to strip, but Plaintiff persisted in refusing to spit out the item in his mouth. (*Id.* ¶¶ 70–71, 92–94; Video 0255 at 11:06:20.)  Eventually, Catalano authorized physical force to retrieve the contraband, and Osowick and Rivera, together with nonparty Raposa, forced Plaintiff onto the bed face-down, while nonparty Penz took control of Plaintiff's legs. (Defs.' 56.1 ¶¶ 71–72; Pl.'s Dep. 85.)

Applying physical force to Plaintiff's torso, limbs, and jaw, Rivera, Osowick, LaTourette, and Raposa sought to compel Plaintiff to spit out the items in his mouth. (*Id.* ¶ 74.) In particular, Osowick held Plaintiff's left arm and Rivera held Plaintiff's head and upper back, while LaTourette pried open Plaintiff's jaw. (*Id.* ¶¶ 76–77; Video 0255 at 11:08:00.) During a lengthy struggle that lasted approximately five minutes, Nedorost stood immediately nearby, while Catalano watched from closer to the cell door. (Defs.' 56.1 ¶¶ 93–96.) According to Plaintiff, the officers "didn't even restrain" him or provide him "the opportunity to cooperate with them," but simply "jumped on" him. (Pl.'s Dep. 86.) Plaintiff also attests that Osowick bent his left wrist while repeatedly demanding that Plaintiff "open up," and that another officer repeatedly "banged" Plaintiff's closed fist into a bed railing. (*Id*. at 86, 99–100.) Plaintiff attests that, at this point, he screamed his willingness to spit out the items, but Defendants did not provide him the opportunity. (*Id.* at 87–89.) Defendants, by contrast, maintain that Plaintiff ignored numerous commands to spit out the items. (Defs.' 56.1 ¶¶ 78–79.) Eventually, Plaintiff spit out two blue latex glove fingers, one containing a cigarette lighter and another containing a cigarette and two pieces of paper with Facebook addresses written on them. (*Id.* ¶ 74.)

After Plaintiff spat out these objects, Rivera pulled Plaintiff to his feet and placed him against the wall. (*Id.* ¶ 80.) Plaintiff then spit out another object, and was immediately placed back onto the bed, after which all use of force ceased. (*Id.* ¶ 81; Video 0255 at 11:13:35.) The prison staff then exited the cell and proceeded to the medical unit, and photos were taken of Plaintiff and the recovered contraband. (*Id.* ¶¶ 82–83.) For several minutes afterward, Plaintiff paced in his cell, examined, massaged and shook his left wrist, and shouted at the guards outside his door. (Video 0255 at 11:16:00–11:25:00.) Afterward, Plaintiff informed his medical

providers that his left wrist, face and neck were hurting, for which he believes he received "over-the-counter pain medication." (Pl.'s Dep. 105–08.)

### 3. The September 23, 2016 Incident

On the morning of September 23, 2016, Plaintiff was on "contraband watch," when Defendant Nedorost ordered Plaintiff to exit his cell for a cell search and extend his arms to be handcuffed. (Defs.' 56.1 ¶¶ 99–100; Pl.'s Dep. 114.) Plaintiff refused to do so, despite attempts by the "[c]haplain, mental health, deputy security" and "[e]verybody that they can think of" to persuade him to cooperate. (*Id.* at 115, 121; Decl. of Paul Nedorost ("Nedorost Decl.") ¶ 8 (Dkt. No. 139).) Eventually, Nedorost entered the cell, accompanied by a team of several helmeted officers, and ordered Plaintiff to put his hands on the wall. (September 23, 2016 Video, No.: ch02_20160923082027 ("Video 2027") at 8:23:40; Defs.' 56.1 ¶ 101.)[11] Plaintiff complied. (*Id.*) Nedorost then instructed LaTourette to "strip frisk" Plaintiff because there appeared to be a blue object in Plaintiff's mouth. (*Id.* ¶¶ 101–02.) During the frisk, Plaintiff was ordered to spit out the object, but Plaintiff refused and appeared to swallow the item. (*Id.* ¶ 103.) Plaintiff attests, however, that "there is no way [he] could have swallowed something because [he] ain't never got it." (Pl.'s Dep. 124.)

After the strip frisk, LaTourette secured Plaintiff's hands behind his back using mechanical restraints, and LaTourette and Osowick escorted Plaintiff out of the cell and placed him against a wall. (Defs.' 56.1 ¶ 104.) Plaintiff attests that, as his hands were secured, LaTourette and Osowick "twisted [his] hands and bent [his] wrists." (Pl.'s Dep. 126–27.) While Plaintiff was outside the cell, nonparties Raposa and Wilson searched the cell thoroughly and

---

[11] According to Plaintiff, Osowick, Latourette, Rivera, Catalano, and Nedorost were involved in the September 23, 2016 incident. (Pl.'s Dep. 123–24.)

found no contraband.  (Defs.' 56.1 ¶ 104.)  Plaintiff was then escorted back into the cell and

again placed against the cell wall.  (*Id.* ¶ 105.)

Nedorost then instructed LaTourette to remove the restraints from Plaintiff's hands, but

Plaintiff objected, suggesting that the officers instead exit the cell and remove his restraints

through the slot in the cell door.  (Pl.'s Dep. 130–31.)  Directed by Nedorost, however,

LaTourette and two other officers immediately proceeded to remove Plaintiff's left wrist from

the mechanical restraints.  (Defs.' 56.1 ¶ 106.)  Video from the event shows Plaintiff gyrating up

and down as the restraints are removed.  (*Id.* ¶ 138; Video 2027 at 8:30:20.)[12]  After Plaintiff's

left hand was freed, LaTourette ordered him to place his hand high and flat on the wall.  (Defs.'

56.1 ¶ 106.)  However, Plaintiff's hand remained clenched in a fist near his chest.  (*Id.* ¶ 107.)

While Plaintiff maintains that LaTourette "held [Plaintiff's] hand and pushed it to [Plaintiff's]

chest," (Pl.'s Dep. 131), LaTourette attests that Plaintiff refused to comply with the instruction to

place his hand on the wall, becoming combative and deliberately clenching his left hand and

holding it to his chest, (Defs.' 56.1 ¶¶ 106–07).

Nedorost then also directed Plaintiff to place his hand against the wall, but Plaintiff did

not obey (and according to Plaintiff, he was prevented by LaTourette from doing so).  (*Id.* ¶ 108;

Pl.'s Dep. 132–34.)  Nedorost then instructed Osowick, LaTourette, Raposa, and Wilson to force

Plaintiff down onto the bed.  (Defs.' 56.1. ¶¶ 109–10.)  As they did so, Plaintiff physically

resisted.  (*Id.* ¶¶ 110; Pl.'s Dep. 138.)  During the struggle, Plaintiff attests he was "getting hit,"

"getting jumped on," "getting the knees hitting [him]," and had "punches being thrown at [him]."

(*Id.* at 139.)  Plaintiff also acknowledges that when he initially experienced the incident, he

---

[12] In contrast to the video evidence, Plaintiff attests that he was "standing still,"
"relaxing," and denies moving his legs as the officers attempted to remove his restraints.  (Pl.'s
Dep. 137–38.)

"didn't even think it was that serious as it was until [he] saw the video."  (*Id.* at 140.)  Osowick used both of his hands to maintain control of Plaintiff's right arm as the officers removed that hand from its restraint.  (Defs.' 56.1. ¶ 111.)

Once both of Plaintiff's wrists were uncuffed, Nedorost ordered Plaintiff to remain on the bed while the prison staff would "peel off" one by one and exit the cell.  (*Id.* ¶ 112.)  However, Plaintiff continued to struggle with the officers as they attempted to disengage.  (Video 2027 at 8:31:20–8:32:34.)  Several officers, including nonparty Wilson, then forced Plaintiff to the floor while LaTourette grabbed both of Plaintiff's legs.  (Defs.' 56.1 ¶¶ 114–15.)  While Plaintiff was on the floor, still struggling, one officer (likely Osowick) appears to have struck him three times.  (Video 2027 at 8:31:35.)[13]  Nedorost then ordered all officers to assist and push Plaintiff under the bed so as to allow all officers to exit the cell safely.  (Defs.' 56.1 ¶ 116.)  Osowick pushed Plaintiff's upper body beneath the bed while nonparty Raposa pulled Plaintiff's mattress off of the bed and used it to obstruct Plaintiff as the officers attempted to exit.  (*Id.* ¶¶ 117–18.)  Despite the obstruction, Plaintiff continued to struggle with the officers, striking at them through the mattress.  (Video 2027 at 8:32:00.)  While holding the mattress in place, the officers peeled off one by one and exited the cell.  (*Id.* at 8:32:20.)

As the final two officers (one of whom was Osowick) exited, Plaintiff charged at the departing officers.  (*Id.* at 08:32:35.)  As Plaintiff neared the cell door, these two officers punched or shoved at Plaintiff, striking him.  (*Id.*)  Plaintiff then struck one of these officers (apparently Osowick) in the face.  (*Id.* at 08:32:37; Pl's. Dep. 146–51; Defs.' 56.1 ¶¶ 119–22.)  Osowick and several other officers then tackled Plaintiff and forced him onto the floor and bed-

---

[13] Plaintiff attests that Osowick punched him three times while he was on the floor.  (Pl's. Dep. 146.)

frame.  (*Id.* ¶¶ 123–24; Pl.'s Dep. 151; Video 2027 at 08:32:38.)  When Plaintiff grabbed the bed

with his left hand, Raposa repeatedly struck Plaintiff's body to force him to release his hold on

the bed.  (Defs.' 56.1 ¶ 124.)[14]  According to Plaintiff, LaTourette, Osowick and possibly Rivera

also struck him as many as ten times while he was on the floor.  (Pl.'s Dep. 151–53.)

LaTourette's punches landed on Plaintiff's face, body and upper torso, while Osowick's

"probably" landed on Plaintiff's head.  (*Id.* at 152.)  At Nedorost's direction, LaTourette placed

mechanical restraints on Plaintiff's hands, while Nedorost applied leg irons.  (Defs.' 56.1 ¶ 125.)

Throughout, Plaintiff continued physically resisting.  (*Id.*)  Once Plaintiff was restrained,

Nedorost directed that he be placed in an upright position against the wall.  (*Id.*)  While Wilson

and a second officer pulled Plaintiff to the wall, Plaintiff attempted to bite Wilson, and Wilson

responded by striking Plaintiff several times.  (*Id.* ¶¶ 126–28.)[15]

Nedorost then ordered the officers to once again "peel off" and exit the cell one at a time.

(*Id.* ¶ 129.)  LaTourette was the last officer to exit, and as he did so, he pushed Plaintiff with both

hands away from the cell door.  (*Id.* ¶ 130.)  Catalano then secured the cell door, and the officers

all proceeded to the medical unit for assessment.  (*Id.* ¶¶ 130–31.)  After the officers exited,

Plaintiff paced in his cell for several moments (still shackled) before sitting down, then lying, on

the bed frame.  (Video 2027 at 08:34:10.)  Shortly thereafter, a medical provider came to the

door of Plaintiff's cell and communicated with Plaintiff.  (Pl's. Dep. 154–55.)  Plaintiff reported

that his back, wrist and ribs were hurting.  (*Id.* at 155.)  An injury report from an hour after the

---

[14] While both Defendants and Plaintiff refer to Plaintiff being forced to the floor, the
video of the incident indicates that Plaintiff was actually forced onto the bed-frame.  (*Compare*
Defs.' 56.1 ¶¶ 123–24 *and* Pl.'s Dep. 151 *with* Video 2027 at 08:32:38.)

[15] Plaintiff attests that LaTourette was involved in placing him against the wall, and that
LaTourette struck him several times.  (Pl.'s Dep. 154.)  It is unclear whether Plaintiff is
identifying the second officer, or whether he disagrees with Defendants' identification of Wilson.

incident notes redness, slight swelling and abrasions, as well as shoulder, knee, and wrist discomfort.  (Defs.' 56.1 ¶ 131; Not. of Mot. Ex. J ("9/23/2016 Inmate Injury Report") (Dkt. No. 141-8).)

   B.  Procedural History

   Plaintiff filed his initial Complaint on October 28, 2016, commencing the instant Action against Defendants as well as against ophthalmologist John Doe and the State of New York. (Compl. (Dkt. No. 2).)  The same day, Plaintiff submitted an application for in forma pauperis ("IFP") status, (Dkt. No. 1), which the Court granted on November 21, 2016, (Dkt. No. 4).  On November 22, 2016, the Court issued an Order of Service that, inter alia, dismissed the State of New York from the Action on immunity grounds.  (Dkt. No. 5.)

   On February 2, 2017, the Court docketed Plaintiff's Amended Complaint, the operative pleading, which names four additional defendants: Zabin, Ream, Chauvin, and Cunningham. (Am. Compl. 5).  At the request of Plaintiff, the Court dismissed Zabin and Chauvin from the Action without prejudice on October 4, 2017.  (Dkt. No. 62).  On March 14, 2018, the Court also dismissed Ream and Cunningham with prejudice.  (Dkt. No. 89; *see also* Dkt. Nos. 90 (Plaintiff consenting to the dismissal of Ream and Cunningham), 106 (Order noting that the Court's earlier order referred to "Reid" instead of "Ream" and again dismissing Ream with prejudice)).

   The remaining Defendants filed the instant Motion and accompanying papers on September 9, 2019.  (Dkt. Nos. 129–41.)  The Court docketed Plaintiff's Response on November 27, 2019.  (Pl.'s Resp. to Defs.' Mot. ("Pl.'s Resp.") (Dkt. No. 149).)  Defendants filed their Reply on November 29, 2019.  (Defs.' Reply Mem. in Supp. of Mot. ("Defs.' Reply") (Dkt. No. 150).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River, N.J. v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry*, 137 F. Supp. 3d at 521 (same).

 "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S.

574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

16

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham,* 848 F.2d at 344; *Mercado v. Div. of N.Y. State Police,* No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and quotation marks omitted).  And, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vt. Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should . . . be[] made in light of the opposing party's pro se status" (italics omitted)).  Nonetheless, "proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence . . . are insufficient to overcome a motion for summary judgment." *Houston*, 27 F. Supp. 3d at 351 (quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same).

B.  Analysis

1.  Applicable Legal Standards

a.  Excessive Force

The Eighth Amendment's guarantee of freedom from "cruel and unusual punishment" encompasses "restraints on prison officials, who may not, for example, use excessive physical force against prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citation omitted). "Analysis of cruel and unusual punishment claims requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for the conduct." *Manley v.*

*Grossman*, No. 13-CV-1974, 2017 WL 4326541, at *8 (S.D.N.Y. Sept. 27, 2017) (citing *Wright*, 554 F.3d at 268).  The objective element focuses on the harm done in light of "contemporary standards of decency," *Wright*, 554 F.3d at 268 (quotation marks omitted), and asks whether "the deprivation alleged is 'sufficiently serious,' or 'harmful enough,' to reach constitutional dimensions," *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citation and quotation marks omitted).  However, "when prison officials use force to cause harm maliciously and sadistically, contemporary standards of decency always are violated.  This is true whether or not significant injury is evident."  *Wright*, 554 F.3d at 268–69 (alteration and quotation marks omitted).

The subjective element requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct."  *Id.* at 268 (citation and some quotation marks omitted); *see also Vail v. Fischer*, No. 12-CV-1718, 2013 WL 5406637, at *5 (N.D.N.Y. Sept. 25, 2013) (noting that an inmate must plead, "subjectively, that the defendant acted wantonly and in bad faith" (citation omitted)).  "This inquiry turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"  *Perry v. Stephens*, 659 F. Supp. 2d 577, 582 (S.D.N.Y. 2009) (quoting *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)).

### b.  Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223,

231 (2009) (citation and quotation marks omitted).  "[Qualified] immunity protect[s]

government's ability to perform its traditional functions . . . by helping to avoid unwarranted

timidity in performance of public duties, ensuring that talented candidates are not deterred from

public service, and preventing the harmful distractions from carrying out the work of government

that can often accompany damages suits." *Filarsky v. Delia*, 566 U.S. 377, 389–90 (2012)

(second alteration in original) (citations and quotation marks omitted).  Qualified immunity

shields a defendant from standing trial or facing other burdens of litigation "if either (a) the

defendant's action did not violate clearly established law, or (b) it was objectively reasonable for

the defendant to believe that his action did not violate such law." *Johnson v. Newburgh*

*Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (citations and quotation marks omitted).

Summary judgment may be granted on the "basis of a qualified immunity defense premised on

an assertion of objective reasonableness [if] the defendant show[s] that no reasonable jury,

viewing the evidence in the light most favorable to the [p]laintiff, could conclude that the

defendant's actions were objectively unreasonable in light of clearly established law." *O'Bert ex*

*rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (second alteration in original)

(citation and quotation marks omitted).

### 2.  Application

In this case, Defendants argue that "the evidence indicates that all force used was proper

and legitimate for the express purpose to restore and maintain discipline."  (Defs.' Mem. of Law

in Supp. of Mot. ("Defs.' Mem.") 6 (Dkt. No. 132).)  Defendants therefore argue that Plaintiff's

Eighth Amendment rights were not violated, and that Defendants are shielded from liability by

qualified immunity.  (*See generally id.*)  The Court first addresses Defendants' excessive force

arguments with respect to each incident in turn, and then turns to their qualified immunity argument.

### a.  September 11, 2016 Incidents

#### i.  Sonko's Entrance

As recounted above, it is undisputed that the September 11, 2016 incident began with Plaintiff not receiving an evening meal and subsequently blocking visual access to his cell during the nightly count of inmates.  (Pl.'s Dep. 38–40; Defs.' 56.1 ¶ 2.)[16]  It is similarly undisputed that Plaintiff failed to respond to verbal commands from both Defendant Crowe and nonparty Sgt. Lorens, and that Sonko subsequently entered the cell.  (*Id.* ¶¶ 1–8.)  However, while Defendants maintain that Plaintiff swung a closed fist in Sonko's direction as he opened the door, (*id.* ¶ 12), Plaintiff attests that he backed away from the door, but that Sonko "started repeatedly punching [him]in [his]head and [his] upper torso area," (Pl.'s Dep. 45.)  Here, because the Parties have "relied solely on assertions made in affidavits or sworn statements to demonstrate the presence or lack of genuine issues of material fact," the Court must accept as true the assertions of "the nonmoving party."  *Kalwasinski v. Artuz*, No. 02-CV-2582, 2003 WL 22973420, at *9 (S.D.N.Y. Dec. 18, 2003) (citation and quotation marks omitted); *see also Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996) (explaining that a nonmovant "will have his allegations taken as true, and will receive the benefit of the doubt when his assertions conflict with those of the movant" (citation

---

[16] Insofar as Plaintiff seeks to raise an Eighth Amendment claim based on the denial of his dinner, such a claim must be dismissed because a "plaintiff's allegation that he may have missed one meal falls far short of the Eighth Amendment standard."  *Rush v. Fischer*, 923 F. Supp. 2d 545, 556 (S.D.N.Y. 2013), *aff'd sub nom. Rush v. Canfield*, 649 F. App'x 70 (2d Cir. 2016); *see also Hankerson v. Nassau Cty. Corr. Facility*, No. 12-CV-5282, 2012 WL 6055019, at *3 (E.D.N.Y. Dec. 4, 2012) ("[The plaintiff's] allegation that he was denied a single meal while incarcerated . . . does not give rise to a constitutional deprivation.").

and quotation marks omitted)).[17]  Accordingly, the Court must proceed as if Plaintiff's sworn

assertion that Sonko simply "started repeatedly punching me in my head and my upper torso

area," (Pl.'s Dep. 45), is correct.[18]

     While Defendants surely were permitted to discipline Plaintiff for repeatedly disobeying

direct orders concerning the blocking of his window, the Court cannot determine as a matter of

law that officers are permitted to punch an inmate "repeatedly" in his "head and torso" as a form

of punishment for such an offense.  In the absence of any physical threat, such a beating may

amount to "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment.

*Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015) (citation and quotation marks omitted).

And while Plaintiff does not allege any severe or lasting injuries from this beating, where force is

"inflicted in a wanton manner, the fact that [resulting injuries] may be de minimis does not

matter." *Kalwasinski*, 2003 WL 22973420, at *8–9 (italics omitted) (denying summary

judgment where the plaintiff attested that an officer needlessly "punched him four to seven times

---

[17] As noted above, while Defendants maintain that the video shows Plaintiff's arm moving "from left to right and strik[ing]" Sonko's head, (Defs.' Mem. 9), the Court finds that the video evidence is ambiguous with respect to this issue, (*see* Video 1618 at 20:25:05).

[18] Defendants argue that the Court may reject Plaintiff's account because (1) this account lacks credibility in light of contradictions between the video evidence and statements from Amended Complaint regarding Plaintiff's position in the cell when Sonko entered; and (2) the ten seconds during which Sonko and Plaintiff were in the cell is not long enough to have subjected Plaintiff to constitutionally significant excessive force.  (Defs.' Mem. 9.)  However, Defendants offer no caselaw to support either argument.  On the contrary, "[i]n applying the summary judgment standard, the court should not weigh evidence or assess the credibility of witnesses."  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citation, alterations, and quotation marks omitted).  Similarly, courts have held that even brief uses of excessive force may be constitutionally significant.  *See Ben-Reuben v. Westchester County*, No. 17-CV-9156, 2019 WL 1406868, at *3–4 (S.D.N.Y. Mar. 28, 2019) (rejecting the argument that an allegation of a "smack" across the face was necessarily a de minimis use of force); *Adilovic v. County of Westchester*, No. 08-CV-10971, 2011 WL 2893101, at * 5 (S.D.N.Y. July 14, 2011) ("When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . ." (citation and quotation marks omitted)).  The Court therefore rejects both arguments.

in the ribs" even though "it [wa]s clear that the [p]laintiff's injuries . . . were not serious"); *see also Hogan v. Fischer*, 738 F.3d 509, 516 (2d Cir. 2013) (emphasizing that "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm" (alteration in original) (citation and quotation marks omitted)).  Here, Plaintiff's version of events is that Sonko initiated a substantial beating that was not in furtherance of an appropriate penological function.  (Pl.'s Dep. 45.)  Accordingly, the Court denies the Motion as to Plaintiff's claim of excessive force by Sonko during the approximately ten seconds prior to when Plaintiff raced out of the cell.  (*Id.* at 46; Video 1618 at 20:25:15.)

### ii. The Struggle on the Floor

Once Plaintiff exited the cell, however, the evidence supports Defendants' claims of reasonable force.  All Parties agree that Plaintiff attempted to run out of the cell.  (Pl.'s Dep. 46; Defs.' 56.1. ¶¶ 13–15.)  Accordingly, it was reasonable for Crowe to tackle Plaintiff and seek to pin him down and prevent him from moving.  (*Id.* ¶ 15.)  *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2019 WL 3239850, at *14 (S.D.N.Y. July 18, 2019) (holding that an inmate "being taken to the ground by [officers] in a forceful manner and restrained on the ground" as part of a disciplinary action could not support an excessive force claim).  Similarly, while Plaintiff attests that, in the ensuing struggle, several officers "weren't just trying to restrain" him, but were "assaulting" him, he also admits that he "tried to fight [the officers] off" and that he was "resisting them."  (Pl.'s Dep. 46–47, 56–57, 64.)  It is undisputed that Plaintiff squirmed, threatened to bite Crowe, tried to flip, flailed his arms backward, and repeatedly kicked his legs. (Defs.' 56.1 ¶¶ 16–18; Pl.'s Dep. 64, 74–75.)  Moreover, video evidence makes clear that Plaintiff continued to struggle as Crowe and Sonko sought to immobilize and pin him to the

floor.  (Video 1618 at 20:25:25.)  Furthermore, Plaintiff attests that he began "screaming and yelling" in an attempt to "get the inmates that w[ere] around . . . riled up, so . . . it could start something bigger than just a use of force.  It can start a riot[,] that type of behavior."  (Pl.'s Dep. 65.)

In light of Plaintiff's violent—and admittedly riotous—resistance, the use of substantial force by officers was justified.  *See Hudson v. McMillian*, 503 U.S. 1, 6 (1992) ("Whether the prison disturbance is a riot or a lesser disruption, corrections officers must . . . act quickly and decisively . . . [and] should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (first alteration in original) (citation, some alterations, and quotation marks omitted)); *see also Beauvoir v. Falco*, 345 F. Supp. 3d 350, 367 (S.D.N.Y. 2018) ("Courts must assess . . . whether force was applied in a good faith effort to maintain or restore discipline . . . ." (citation and quotation marks omitted)), *appeal dismissed*, 2019 WL 254279 (2d Cir. May 7, 2019); *Perry v. Stephens*, 659 F. Supp. 2d 577, 582–83 (S.D.N.Y. 2009) (granting summary judgment to prison officers where they used force in response to an inmate's attempt to kick one of them).  Moreover, both objectively and in light of the seriousness of the struggle, Plaintiff's resulting injuries were minor.  (*See* 9/11/2016 Injury Report (noting only "superficial abrasions" to the right and left shoulder, right back, bilateral chest wall, right shoulder, left eye and ear).)  *See Perry*, 659 F. Supp. 2d at 582–83 (finding that minor bruising and pain that abated after four days following treatment with ointment and aspirin was de minimis, and collecting cases to similar effect).  Although the Supreme Court has rejected the notion that "significant injury is a threshold requirement for stating an excessive force claim," it has repeatedly emphasized that the "extent of injury suffered by an inmate is one factor that may

suggest whether the use of force could plausibly have been thought necessary in a particular

situation." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (citation and quotation marks omitted).

Accordingly, the relatively minor nature of Plaintiff's injuries militates against a finding of

"malicious or deliberately indifferent intent" and "weighs in Defendants' favor." *Beauvoir*, 345

F. Supp. 3d at 367. Thus, because undisputed evidence establishes that Defendants used limited

force to gain control of a physically violent inmate, Plaintiff's excessive force claims against

Defendants based on force used after Plaintiff exited the cell until when he was fully restrained,

(*see* Defs.' 56.1 ¶ 23), are dismissed.

### iii. The Alleged Neck Grab

Immediately after Plaintiff was restrained, several officers, including Crowe, lifted

Plaintiff up from the floor and placed him against a wall. (*Id.* ¶¶ 23–24; Video 1618 at

20:30:15.) Plaintiff attests that as he was lifted, an officer "grabbed [him] by the neck" such that

he "started to get dizzy like [he] was going to pass out." (Pl.'s Dep. 48.) However, Plaintiff

acknowledges that as he was lifted, he was "excited" and "screaming," and that as soon as he

said, "I can't breathe. I can't breathe," the officer released his neck. (*Id.*)

Plaintiff's statements undermine his Eighth Amendment claims. By Plaintiff's own

account, the application of force was brief, occurred while he was in an "excited" state, and

ceased as soon as he protested. (*Id.*) The brevity of this force, and the fact that it ceased as soon

as plaintiff protested, undermines any "inference . . . of personal resentment or malice." *Cox v.*

*Fischer*, 248 F. Supp. 3d 471, 486 (S.D.N.Y. 2017) (citation omitted). Moreover, such a brief

use of force is "de minimis" and so cannot support a finding of "wantonness" as a matter of law.

*See Hudson*, 503 U.S. at 9 ("Not every push or shove, even if it may later seem unnecessary in

the peace of the judge's chambers, violates a prisoner's constitutional rights." (citation and

quotation marks omitted)); *see also Lebron*, 2019 WL 3239850, at *14 (explaining that a brief

use of force in the face of resistance was de minimis and non-actionable); *Cox*, 248 F. Supp. 3d.

at 485–86 (finding that a use of force was de minimis where an officer "'slammed' [the plaintiff]

into bunk beds, pulled his right arm behind his back, pushed his face towards a wall, and shoved

him into two lockers" and the plaintiff suffered minor, short-term injuries (record citation

omitted)).

### iv.  The Encounter with Montgomery

At some point after Plaintiff was escorted to the dry cell, Plaintiff attests he engaged in a

dispute with Montgomery that culminated in Montgomery entering the cell, where he "punched"

and "slapped" Plaintiff.  (Pl.'s Dep. 49.)  While it bears noting that the sole basis for Plaintiff's

allegation is his own deposition, because Plaintiff is the "non-moving party" the Court is not free

to disregard his account simply because it might be "extremely weak."  *Kalwasinski*, 2003 WL

22973420, at *8.  Accordingly, the Court must, at this stage, assume that Montgomery in fact

punched and slapped Plaintiff, and that he did so absent a threat from Plaintiff.

While many cases in the Second Circuit have held that "an open-handed slap . . . with no

medical evidence and no other evidentiary support of injury, does not rise to the level of a

constitutional violation," *Santiago v. City of Yonkers*, No. 13-CV-1077, 2015 WL 6914799, at *8

(S.D.N.Y. Oct. 30, 2015) (citation and quotation marks omitted), most such cases were decided

prior to the Supreme Court's decision in *Wilkins*, which clarified that a plaintiff need not meet an

arbitrary "non-de minimis" injury threshold, *Wilkins*, 559 U.S. at 39 (italics and quotation marks

omitted); *see also Yearwood v. LoPiccolo*, No. 95-CV-2544, 1998 WL 474073, at *7 (S.D.N.Y.

Aug. 10, 1998) (holding, prior to *Wilkins*, that choking the plaintiff, hitting his head with a pair

of keys, and punching him in the lip constituted de minimis force when medical records

indicated that the plaintiff suffered "a minor bump" and "slight bleeding" from a self-inflicted injury); *Shabazz v. Pico*, 994 F. Supp. 460, 471 (S.D.N.Y. 1998) (holding, prior to *Wilkins*, that kicking inmate's ankles and feet was de minimis when the plaintiff attributed no injury to the incident).   Moreover, here, Plaintiff alleges several punches, rather than a single slap.  *Cf.* *Johnson v. Renda*, No. 96-CV-8613, 1997 WL 576035, at *1 (S.D.N.Y. Sept. 15, 1997) (holding that a single, spontaneous slap to plaintiff's face was insufficient to establish constitutional violation).   Additionally, as the Court explained above, where force is "inflicted in a wanton manner, the fact that [resulting injuries] may be de minimis does not matter."  *Kalwasinski*, 2003 WL 22973420, at *9 (italics omitted); *see also Hogan*, 738 F.3d at 516 (explaining that even relatively minor uses of force may still amount to an Eighth Amendment violation because "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm" (alteration in original) (citation and quotation marks omitted)).   Here, Plaintiff attests that Montgomery struck him multiple times after a purely verbal altercation and for no legitimate penological purpose.  (Pl.'s Dep. 49.) Moreover, Plaintiff attests that, immediately prior to attacking him, Montgomery stated that "back in the day . . . [Plaintiff] would have got [his] head split open."  (*Id.* at 51.)  Such a statement offers additional support for the "subjective element" of Plaintiff's excessive force claim.  *See Perry*, 659 F. Supp. 2d at 581–82 (explaining that a prison official must "possess a 'wanton' state of mind when he . . . engaged in the alleged conduct" (citation omitted)). Accordingly, the Court cannot say as a matter of law that Plaintiff's description fails to support a possible claim for a wanton assault of constitutional dimension.

### b.  The September 22, 2016 Incidents

### i. The Initial Altercation

It is undisputed that the September 22, 2016 incident began after Defendants LaTourette, Nedorost, and Rivera entered Plaintiff's cell in response to Plaintiff's prohibited use of a cigarette.  (Defs.' 56.1 ¶¶ 61–64.)  Further, it is undisputed that after being directed to place his hands on a wall, Plaintiff instead shoved a cigarette lighter into his mouth and refused to spit it out.  (*Id.* ¶ 65; Pl.'s Dep. 82.)  Thus, while Plaintiff attests Defendants "jumped on [him] . . . and roughed [him] up a little bit," by Plaintiff's own account, this force was used during an attempt to recover contraband and to place him in handcuffs.  (*Id.* at 82–84).  The force was therefore indisputably used in an "effort to maintain or restore discipline" rather than for purely sadistic purposes.  *Hogan*, 738 F.3d at 516 (citation and quotation marks omitted).  Indeed, as courts in the Second Circuit have held, the use of force in searching for contraband on the body of a prisoner is appropriate.  *See Torres v. City of New York*, No. 17-CV-6604, 2019 WL 4784756, at *4–5 (S.D.N.Y. Sept. 30, 2019) (granting summary judgment where defendant officers used chokeholds in the removal of the contraband); *Tavares v. City of New York*, No. 08-CV-3782, 2011 WL 5877550, at *5 (S.D.N.Y. Oct. 17, 2011), *report and recommendation adopted*, 2011 WL 5877548 (S.D.N.Y. Nov. 23, 2011) (explaining that defendants officers did not use excessive force in "throwing [the plaintiff] up against the wall, kicking his legs apart, subjecting him to a forceful pat frisk, and verbally harassing him"); *Brown v. Busch*, 954 F. Supp. 588, 597 (W.D.N.Y. 1997) (granting summary judgment to defendant officers on excessive force claims related to having "pushed, shoved and struck" the plaintiff because the defendants had "a legitimate penological interest in conducting the pat-frisk procedure without distractions or disruptive behavior"); *see also Crawford*, 796 F.3d at 258 (explaining that physically invasive

searches which might otherwise amount to excessive force are permissible when officers are seeking contraband). Here, moreover, Plaintiff himself claims that Defendants only "roughed [him] up *a little bit*." (Pl.'s Dep. 82 (emphasis added).) Accordingly, because even Plaintiff admits that only limited force was applied, and that such force was used pursuant to the legitimate disciplinary needs of the prison, Plaintiff cannot invoke such force to sustain a claim under the Eighth Amendment. *See Lebron*, 2019 WL 3239850, at *14 (granting summary judgment to defendant officers where evidence established that they jumped on top of the plaintiff, causing "almost no injury," after plaintiff kicked or attempted to kick one of them); *Beauvoir*, 345 F. Supp. 3d at 370 (explaining that the "correlation between the need for force and the amount of force used . . . [i.e.,] the principle proportionality" is an important factor in analyzing excessive force claims).

### ii.  The Struggle in the Observation Cell

It is undisputed that Rivera and LaTourette then escorted Plaintiff to an observation cell, where, together with Nedorost and Osowick, they removed Plaintiff's wrist restraints, placed him against the cell wall (unshackled), and "pat-frisked" his whole (clothed) body. (Defs.' 56.1 ¶¶ 66, 68, 85–89.) It is further undisputed that Plaintiff initially refused to submit to a strip frisk (before eventually doing so upon the Catalano's arrival) and continued to refuse to spit out the contraband in his mouth. (*Id.* ¶¶ 68–71; Pl.'s Dep. 84.) Similarly, it is undisputed that Catalano authorized physical force, and that Osowick, Rivera, and LaTourette (together with nonparties Raposa and Penz) used substantial force, in an attempt to gain physical control of Plaintiff and force him to release the contraband. (Defs.' 56.1 ¶¶ 71–74; Pl.'s Dep. 85.) Finally, it is undisputed (and video and documentary evidence confirms) that all force ceased immediately after Plaintiff spit out the contraband, and that Plaintiff's resulting injuries were minimal.

(Defs.' 56.1 ¶ 82; Pl.'s Dep. 105–108; Video 0255 at 11:13:35, 11:16–11:25; Not. of Mot. Ex. G ("9/22/2016 Injury Report") (Dkt. No. 141-5).)[19]

As noted above, the use of substantial force in searching for contraband on the body of a prisoner is generally appropriate. *See Torres*, 2019 WL 4784756, at *4–5 (granting summary judgment where defendant officers used chokeholds during a seizure of contraband); *see also Crawford*, 796 F.3d at 258 (explaining that physically invasive searches which might otherwise amount to excessive force are permissible when officers are seeking contraband). Moreover, the fact that the use of force ceased after Plaintiff spat out the contraband demonstrates that such force was used in the service of a legitimate objective, rather than for wanton purposes. *See Coleman v. City of New York*, No. 07-CV-1051, 2010 WL 571986, at *5 (S.D.N.Y. Feb. 2, 2010) (holding that, because "the force ceased as soon as [an inmate] was securely handcuffed, . . . the force was plainly applied to restore order[,] not for any malicious or sadistic purpose"). Finally, it is well-established that "the extent of the plaintiff's injury" is an important consideration in determining the reasonableness of force. *Ben-Reuben v. Westchester County*, No. 17-CV-9156, 2019 WL 1406868, at *3 (S.D.N.Y. Mar. 28, 2019) (quoting *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015)). Here, Plaintiff suffered no injuries other than "superficial abrasions," "slight swelling," "superficial scratches," and "areas of redness." (9/22/2016 Injury Report.) As demonstrated both by the medical report and video evidence, afterward, Plaintiff was fully capable of moving about normally, and shouting, in his cell. (*Id.*; Video 0255 at 11:13:35,

---

[19] Plaintiff's general assertion that "they didn't even give me the opportunity to cooperate with them," (Pl.'s Dep. 86), is belied by many of Plaintiff's other, more specific, statements: "I just stick my head out like I am not opening my mouth," (*id.* at 84); "I am still saying no, like . . . I ain't opening my mouth," (*id.* at 84–85); "he gave me my last, the last order, a half an hour to open my mouth," (*id.* at 85). Similarly, Plaintiff's statement that he was physically prevented from spitting out the item is contradicted by his own statement that he was able to open his mouth repeatedly to tell the officers "let me spit it out." (*Id.* at 89.)

11:16:00–11:25:00.)  Accordingly, because the undisputed record indicates that the force used during this incident was proportionate to a legitimate aim and resulted in de minimis injuries, Plaintiff cannot meet the objective component of the excessive force standard.  *See Rodriguez v. City of New York*, 802 F. Supp. 2d 477, 481 (S.D.N.Y. 2011) ("Because the Court finds that no rational jury could return a verdict . . . on the objective component of the excessive force inquiry, . . . the Court grants Defendants' motion for summary judgment on the claim of excessive force.").

### c.  The September 23, 2016 Incidents

#### i. The Alleged Hand Twisting

It is undisputed that Plaintiff repeatedly refused instructions from multiple prison officials to exit his cell for a cell search, but that he eventually consented to a strip search within his cell.  (Defs.' 56.1 ¶¶ 99–103; Pl.'s Dep. 114–24; Video 2027 at 8:23:40.)  It is also undisputed that, after the strip frisk, LaTourette and Osowick secured Plaintiff's hands behind his back and escorted him outside the cell.  (Defs.' 56.1 ¶ 104; Pl.'s Dep. 126–27.)  However, Plaintiff attests that as soon as his hands were secured, LaTourette and Osowick "twisted [his] hands and bent [his] wrist."  (*Id.*)

In some circumstances, improper use of handcuffs may constitute excessive force.  *See Kerman v. City of New York*, 261 F.3d 229, 239–40 (2d Cir. 2001) (denying summary judgment on Fourth Amendment claims where arresting officers may have employed unnecessary "handcuff tightening, infliction of pain, verbal abuse, humiliation and . . . confinement to a restraint bag in a painful position").  However, the "failure to allege any continuing injury from the handcuffing is fatal to a claim of excessive force" under the Eighth Amendment.  *Perkins v. Perez*, No. 17-CV-1341, 2019 WL 1244495, at *12 (S.D.N.Y. Mar. 18, 2019) (citation and

quotation marks omitted); *see also Blue v. City of New York*, No. 14-CV-7836, 2018 WL 1136613, at *11 (S.D.N.Y. Mar. 1, 2018) ("Generally, handcuffing that does not cause injury beyond temporary discomfort or bruising does not rise to the level of an excessive force claim." (citation omitted)).  Such requirements preclude any Eighth Amendment claim based on this incident.  Plaintiff can point to no evidence (nor does even allege) that he suffered any "continuing injury" from this handcuffing.  (*See* 9/23/2016 Inmate Injury Report.)  Moreover, Plaintiff can point to no facts indicating that the twisting of his wrists was deliberate, let alone "malicious or sadistic."  *Wright*, 554 F.3d at 270.  Plaintiff cannot, therefore, establish either the objective or subjective components of an excessive force claim based on this episode. Accordingly, any Eighth Amendment claim based on the alleged use of handcuffs does not survive this Motion.  *See Lebron*, 2019 WL 3239850, at *15 (granting summary judgment where the plaintiff could not establish the objective or subjective components of his Eighth Amendment claims).

### ii. The Struggle on the Floor

It is undisputed that after the cell search was complete, the officers escorted Plaintiff back into the room, placed him against the wall, and began to uncuff him.  (Defs.' 56.1 ¶¶ 105–06; Video 2027 08:29:50.)  While Plaintiff attests that he was "standing still," "relaxing," and denies moving his legs or resisting as the officers attempted to remove his restraints, (Pl.'s Dep. 137–38), video from the event clearly shows Plaintiff gyrating substantially as the officers attempted to remove the restraints.  (Video 2027 08:30:10.)  Similarly, although video evidence cannot resolve the dispute regarding whether LaTourette "held [Plaintiff's] hand and pushed it," (Pl.'s Dep. 131), or whether Plaintiff deliberately clenched his left hand and held it to his own chest, (Defs.' 56.1 ¶¶ 106–07), it is clear from the video that Plaintiff was resisting not just LaTourette,

but the other officers as well, (*see* Video 2027 8:30:30).  Moreover, it is also undisputed (and video confirms) that after Nedorost instructed Osowick, LaTourette, Raposa, and Wilson to place Plaintiff down onto the bed, Plaintiff's physical resistance became violent and continuous. (Defs.' 56.1. ¶¶ 108–10; Pl.'s Dep. 138; Video 2027 at 8:31:20–8:33:25.)  Indeed, video evidence confirms that Plaintiff attacked Defendants even after they sought to extricate themselves from the interaction and exit Plaintiff's cell.  (*Id.* at 8:32:00.)  Finally, it is undisputed that Plaintiff suffered no severe and lasting injuries, but simply "redness, slight swelling and abrasion[s]" and "complaints of shoulder, knee, and wrist discomfort."  (Defs.' 56.1 ¶ 131; 9/23/2016 Inmate Injury Report.)

Plaintiff cannot maintain his claims in light of these undisputed facts.  Given Plaintiff's apparent physical resistance as officers attempted to remove his handcuffs while Plaintiff was standing upright, Nedorost's order that Plaintiff be laid down on the bed was not constitutionally excessive.  *See Lebron*, 2019 WL 3239850, at *14 (holding that an inmate "being taken to the ground by [officers] in a forceful manner and restrained on the ground" as part of a disciplinary action could not support an excessive force claim).  And once Plaintiff's resistance became even more wild and violent, Defendants were all the more justified in using force to subdue him.  *See Hogan*, 738 F.3d at 516 (explaining that there is no Eighth Amendment violation where "force was applied in a good-faith effort to maintain or restore discipline" (citation and quotation marks omitted)); *see also Perry*, 659 F. Supp. 2d at 582–83 (granting summary judgment to prison officers where they used force in response to an inmate's attempt to kick one of them).  Moreover, Defendants' repeated attempts to extricate themselves from the fight, and the limited nature of the injuries Plaintiff sustained, both strongly indicate that Plaintiff's use of force was objectively reasonable.  *See Ben-Reuben*, 2019 WL 1406868, at *3 (explaining that "any effort

made by the officer to temper or to limit the amount of force" and "the extent of the plaintiff's injury" are considerations that that may bear on the objective reasonableness of a use of force).

Plaintiff argues that some of Defendants' actions were beyond that which was strictly necessary to regain control and immobilize him.  In particular, he attests that Osowick struck him several times during the initial struggle on the floor, (Pl.'s Dep. 146; *see also* Video 2027 at 8:31:35), and that several officers, including LaTourette, Osowick and possibly Rivera, punched him as many as ten times after he charged them and was tackled, (Pl.'s Dep. 151–52).  But strict necessity is not the test.  *See Hudson*, 503 U.S. at 9 ("Not every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers, violates a prisoner's constitutional rights.") (citation and quotation marks omitted); *Beauvoir*, 345 F. Supp. 3d at 369 ("[W]hilst [the defendant's] use of the pepper spray may not have been strictly necessary, . . . it was permissible in the context of needing to maintain a baseline of order in the prison system.").  Rather, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hogan*, 738 F.3d at 516 (alteration in original) (citation and quotation marks omitted).  Here, Plaintiff's repeated attempts to strike Defendants and his violent charge as they attempted to exit his cell establish that Plaintiff posed a substantial threat, and thus substantial force was permissible in response.  *See Beauvoir*, 345 F. Supp. 3d at 363 (explaining that "to determine whether [the] [d]efendants acted maliciously or wantonly," courts must examine, inter alia, "the threat" posed by the plaintiff).  Thus, the Court need not determine whether every blow struck by Defendants was strictly necessary; here, Plaintiff's ongoing violent conduct precludes a finding that ten or thirteen blows were "repugnant to the conscience of mankind" or "contrary to contemporary standards of decency." *Hogan*, 738 F.3d at 516 (citations and quotation marks omitted).  Accordingly, the Court

concludes that Defendants are entitled to summary judgment on all claims relating to the September 23, 2016 incident.

### d. Qualified Immunity

Defendants also argue that they are entitled to qualified immunity because their conduct was "objectively reasonable because Plaintiff repeatedly refused orders [on] multiple dates, attempted to and assaulted officers and was physically combative on each date." (Defs.' Mem. 15.) As the Court has granted summary judgment to Defendants on most of Plaintiff's claims, it considers the qualified immunity argument only with respect to the surviving claims (i.e., the limited claims against Sonko and Montgomery).

Defendants' qualified immunity argument is unpersuasive. First, the two paragraphs that Defendants devote to the issue in their memorandum are conclusory and "fail to meaningfully apply the qualified immunity caselaw to this case." *Lebron*, 2019 WL 3239850, at *19 n.13; *see also Johnson v. Doty*, No. 15-CV-7823, 2019 WL 2137361, at *3 n.4 (S.D.N.Y. May 16, 2019) (declining to consider qualified immunity argument where defendants "merely restate[d] the qualified immunity caselaw without meaningfully applying that caselaw to the facts of th[e] case"); *Ben-Reuben*, 2019 WL 1406868, at *4 n.1 (same).

Second, the Court concludes that Defendants' qualified immunity arguments fail for substantially the same reasons that the Court found a dispute of material fact with respect to the existence of a constitutional violation in the first place. Defendants do not dispute, nor could they dispute, that "the right under the Eighth Amendment to be free from excessive force is clearly established." *Manley*, 2017 WL 4326541, at *10 (citation and quotation marks omitted). Thus, the only contested issue is whether it was "objectively reasonable" for Sonko and Montgomery to believe that their actions did not violate that clearly established right. However,

with respect to both of the relevant incidents, Plaintiff attests that he was repeatedly punched absent provocation or resistance. The Court cannot conclude as a matter of law that a reasonable officer would believe that such conduct did not violate the Eighth Amendment. *See id.* at *11 (rejecting a qualified immunity defense where plaintiff attested that he was "punched, kicked or hit . . . after he had been taken to the ground and handcuffed"); *Kalwasinski*, 2003 WL 22973420, at *10 (concluding that "a reasonable officer in the [d]efendant's position would have believed that punching the [p]laintiff in the ribs violated the [p]laintiff's rights" and therefore rejecting defendant's qualified immunity defense). Accordingly, Defendants' requests for qualified immunity are denied with respect to the two remaining claims.

### III.  Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part. Claims against all Defendants other than Sonko and Montgomery are hereby dismissed with prejudice. Plaintiff's excessive force claims against Sonko and Montgomery, based on their conduct toward Plaintiff on the evening of September 11, 2016, remain.

The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. Nos. 129, 141), enter judgment in favor of all Defendants except for Sonko and Montgomery, and mail a copy of this Opinion to Plaintiff.

SO ORDERED.

DATED:      April 23, 2020
            White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE